**Opinion filed March 19, 2026**



In The

# Eleventh Court of Appeals

_____

## No. 11-25-00273-CV

_____

## IN THE INTEREST OF T.M., A CHILD

**On Appeal from the 326th District Court**
**Taylor County, Texas**
**Trial Court Cause No. 11230-CX**

## M E M O R A N D U M   O P I N I O N

This is an accelerated appeal from the trial court's order terminating the parental rights of the mother and father of T.M.[1]  *See* TEX. FAM. CODE ANN. § 161.001(b) (West Supp. 2025).  Only the mother appealed.

In three issues, Appellant challenges the sufficiency of the evidence to support the trial court's findings that: (1) she endangered the child under Sections 161.001(b)(1)(D) and (E) of the Texas Family Code; (2) termination of her parental rights is in the child's best interest; and (3) the Texas Department of Family

---

[1]We use initials to refer to the child.  *See* TEX. R. APP. P. 9.8(b).

and Protective Services (the Department) made reasonable efforts to return the child prior to commencement of the final hearing. *See id.* § 161.001(b)(1)(D), (E), (b)(2), (f). For the reasons expressed below, we affirm in part, and we reverse and remand in part.

## I. *Termination Findings and Standards*

The termination of parental rights must be supported by clear and convincing evidence. FAM. § 161.001(b). To terminate one's parental rights, it must be shown by clear and convincing evidence that the parent has committed one of the acts listed in Section 161.001(b)(1), and that termination is in the best interest of the child. *Id.* Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007 (West 2019).

In this case, the trial court found that clear and convincing evidence established that Appellant: (1) knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endangered the physical or emotional well-being of the child; and (2) engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangered the physical or emotional well-being of the child. *See id.* § 161.001(b)(1)(D), (E). The trial court further found that termination of Appellant's parental rights is in the child's best interest. *See id.* § 161.001(b)(2). In accordance with Section 161.001(f), the trial court found that the Department made reasonable efforts to return the child to Appellant, but that a continuing danger remained in the home that prevented the child's return. *See id.* § 161.001(f).

In reviewing a legal sufficiency challenge, we must decide whether "a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.W.*, 645 S.W.3d 726, 741 (Tex. 2022). Cognizant of the required

appellate deference to the factfinder, "we look at all the evidence in the light most favorable to the finding, assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so, and disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible." *Id.* (internal quotation marks omitted). "However, we may not disregard 'undisputed facts that do not support the finding,'" and the factfinder is "the sole arbiter of the witnesses' credibility and demeanor." *Id.* (first quoting *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002); and then quoting *In re J.F.-G.*, 627 S.W.3d 304, 312 (Tex. 2021)). As such, when considering the credibility of the evidence presented, we may not substitute our judgment for that of the factfinder. *J.F.-G.*, 627 S.W.3d at 316.

In assessing whether the evidence is factually sufficient, we weigh the disputed evidence that is contrary to the finding against all the evidence that favors the finding. *In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018). We give due deference to the finding and determine whether, on the entire record, a factfinder could reasonably form a firm belief or conviction about the truth of the allegations against the parent. *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009); *In re C.H.*, 89 S.W.3d 17, 25–26 (Tex. 2002); *In re L.C.C.*, 667 S.W.3d 510, 512 (Tex. App.—Eastland 2023, pet. denied). Because a trial court conducting a de novo hearing "may also consider the record from the hearing before the associate judge," we may do so if it is included in the appellate record, as it is here. *See* FAM. § 201.015(c) (West 2020); *In re A.L.M.-F.*, 593 S.W.3d 271, 277 (Tex. 2019) ("[R]eview under [S]ection 201.015 is not entirely independent of the proceedings before the associate judge.").

With respect to the best interest of the child, no unique set of factors need be proved. *L.C.C.*, 667 S.W.3d at 513; *In re C.J.O.*, 325 S.W.3d 261, 266 (Tex. App.—Eastland 2010, pet. denied). Further, the best interest determination does not restrict the proof to any specific factor or factors. *In re J.S.*, 687 S.W.3d 541, 547 (Tex.

App.—Eastland 2024, no pet.). However, courts may use the non-exhaustive *Holley* factors to shape their analysis. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). These include, but are not limited to: (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the best interest of the child; (6) the plans for the child by these individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent that may indicate the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Id.*

To support a best interest finding, the Department is not required to prove each *Holley* factor; in some circumstances, evidence of the presence of only one factor will suffice. *C.H.*, 89 S.W.3d at 27; *In re D.M.*, 452 S.W.3d 462, 473 (Tex. App.—San Antonio 2014, no pet.). Additionally, the same evidence that proves one or more statutory grounds for termination may also constitute sufficient, probative evidence illustrating that termination is in the child's best interest. *C.H.*, 89 S.W.3d at 28; *C.J.O.*, 325 S.W.3d at 266.

The absence of evidence of some *Holley* considerations does not preclude the factfinder from reasonably inferring or forming a strong conviction or belief that termination is in the child's best interest, particularly if the evidence indicates that the parent-child relationship and the parent's conduct has endangered the safety and well-being of the child. *C.H.*, 89 S.W.3d at 27. This is so because the best interest analysis evaluates the best interest of the child, not the parent. *J.S.*, 687 S.W.3d at 548; *In re E.C.R.*, 638 S.W.3d 755, 767 (Tex. App.—Amarillo 2021, pet. denied) (citing *In re B.C.S.*, 479 S.W.3d 918, 927 (Tex. App.—El Paso 2015, no pet.)).

In this regard, the factfinder may measure a parent's future conduct by his or her past conduct in determining whether termination of a parent's parental rights is in the child's best interest. *J.S.*, 687 S.W.3d at 548; *In re Z.R.M.*, 665 S.W.3d 825, 829 (Tex. App.—San Antonio 2023, pet. denied); *In re D.S.*, 333 S.W.3d 379, 384 (Tex. App.—Amarillo 2011, no pet.). The factfinder may infer that a parent's past conduct that endangered the safety and well-being of the child may recur in the future if the child is returned to the possession of the parent. *In re J.D.*, 436 S.W.3d 105, 118 (Tex. App.—Houston [14th Dist.] 2014, no pet.); *May v. May*, 829 S.W.2d 373, 377 (Tex. App.—Corpus Christi–Edinburg 1992, writ denied). Moreover, the factfinder may infer from a parent's past inability to meet the child's physical and emotional needs an inability or unwillingness by the parent to meet the child's physical and emotional needs in the future. *J.D.*, 436 S.W.3d at 118; *see also In re A.S.*, No. 11-16-00293-CV, 2017 WL 1275614, at *3 (Tex. App.—Eastland Mar. 31, 2017, no pet.) (mem. op.).

## II. *The Evidence Presented at Trial*

The Department has been involved with Appellant and the father since the birth of their first child, N.M.,[2] in January 2021. Appellant became pregnant with N.M. after she and the father had been in a relationship for a few months. The parents submitted to drug screens with the Department in April 2021; after they both tested positive for marihuana, they began participating in family-based safety services (FBSS).[3] Appellant's drug test results from June through September 2021

---

[2]N.M. was not a subject of the underlying termination proceeding. Although the Department was granted managing conservatorship of N.M. in a separate proceeding, Appellant retained her parental rights to N.M.

[3]"Family-based safety services are protective services provided to a family whose children are not in the conservatorship of the Department." 40 TEX. ADMIN. CODE ANN. § 700.710 (2021). The Department's Child Protective Services Division provides family-based safety services to families and children "to: (1) protect the children from abuse and neglect; (2) help the family reduce the risk of future abuse or neglect; and (3) prevent the removal of the children from their home." *Id.* Specifically, the family

were negative for all prohibited substances. However, in February and March 2022, Appellant tested positive for marihuana. Also in March 2022, the father tested positive for cocaine and marihuana. The Department was granted temporary managing conservatorship of N.M. in March 2022 after N.M. tested positive for methamphetamine, cocaine, and marihuana.

T.M. was born in August 2022, while the Department's case involving N.M. was pending. In July 2023, Appellant was caught stealing "diapering items" and eczema cream for T.M. that she could not afford to purchase. She was subsequently placed on deferred adjudication community supervision for Class B misdemeanor theft. *See* TEX. PENAL CODE ANN. § 31.03(a), (e)(2) (West Supp. 2025).

Appellant completed several of her service plan requirements for the pending suit involving N.M. She had stable housing, regularly tested negative on her drug screens, and was employed as a housekeeper at the Baymont Inn. However, Appellant was aware that the father continued using marihuana and was not participating in services. "[H]e was around" and "ha[d] contact with [T.M.]" but was not living with Appellant and T.M.

In September or October 2023, the Department approved a monitored return of N.M. to Appellant, and she and T.M. were drug tested as part of the process. Appellant tested negative, but T.M. tested positive for methamphetamine, cocaine, and marihuana. When Department investigator Kelly Loza spoke to Appellant about T.M.'s drug test results, Appellant suggested her workplace or T.M.'s paternal grandfather, a known cocaine user, as potential sources of the child's exposure to drugs. Appellant took T.M. to work with her because she could not afford childcare and stated that she routinely discovered illegal drugs while cleaning guest rooms.

---

was ordered to participate in services through the Texas Family First (TFF) pilot program. *See* FAM. §§ 262.402–.410 (authorizing and implementing the Family Preservation Services Pilot Program).

Loza also suspected that the father may have exposed T.M. to illegal drugs during his unsupervised contact with the child, and informed Appellant that she could no longer bring T.M. with her to the Baymont Inn.

Appellant signed a safety plan that prohibited her unsupervised contact with T.M., and all contact between the child and the father until the father began cooperating with the Department. The following day, Loza discovered Appellant, T.M., and the father at the Baymont Inn in violation of the safety plan and learned that the father resided there. The Department was later granted temporary managing conservatorship of T.M. on October 19, 2023.

Appellant's family plan of service for T.M.'s case was approved and adopted as an order of the trial court in December 2023. As part of Appellant's service plan, she was required to: (1) maintain legal employment and safe, stable housing that was free of illegal substances; (2) attend individual counseling and parenting classes; (3) complete a psychological evaluation and, if she tested positive at any time for illegal substances, complete a drug and alcohol assessment; and (4) submit to random drug testing. Appellant was likewise ordered to attend parent-child visitations, and to refrain from all criminal activity, the use of illegal substances, and associating with individuals who use illegal substances.

Following T.M.'s removal, Appellant left her employment at the Baymont Inn, maintained consistent contact with her permanency case manager, Kristian Castro, and tested negative for all illegal substances on her monthly drug screens. At that time, she was also reporting to her community supervision officer for drug screens as a condition of her deferred adjudication for her theft case; however, on May 14, 2024, Appellant's rapid hair test that was administered by the Taylor County probation department showed positive results for methamphetamine and fentanyl. Appellant notified Castro of the results on the same day and requested that

7

she be allowed to submit to both a urinalysis and hair follicle drug test; Castro sent her for those tests the next day. The results of these tests, as conducted through the Department, were negative. Appellant denied using methamphetamine and fentanyl and explained that the rapid hair test results may have been caused by taking a Percocet for recurring stomach pain.

In June 2024, Appellant was adjudicated guilty of theft, her community supervision was revoked, and she was sentenced to confinement in the Taylor County Adult Detention Center for ninety days. Appellant received mental health services and medication during her confinement and continued participating in those services after her release in August 2024.

By March 2025, Appellant had successfully completed her service plan requirements, and her drug test results were all negative. Given Appellant's progress, the Department considered a monitored return of T.M. However, Appellant's hair follicle drug test results from March 5, 2025, were positive for marihuana metabolite "at the cut-off level" of 0.1 picograms per milligram (pg/mg). Appellant told Castro that she bought a "vape pen [with] CBD" at a gas station because she was anxious about the upcoming termination hearing. Upon receiving the results, the Department changed its permanency goal to termination of Appellant's parental rights.

The parties appeared on April 16, June 18, and June 26, 2025, for the final hearing before the associate judge. Castro testified that Appellant successfully completed her services, had a safe, stable home environment, and was working two jobs. One of the Department's remaining concerns was whether Appellant could protect her children from the father and other "individuals that she should not have her children around." "[E]arlier in the case . . . [m]ore towards the beginning," Appellant told Castro that "she would not keep her children from their father."

Appellant denied having contact with the father in their conversations since then, and Castro admitted that she had no knowledge of Appellant associating with the father "as of recent." Castro also made several unannounced visits to Appellant's current home—Castro testified that the home was clean and appropriate, Appellant had a room set up for her children, and there was no indication that the father had been there or had contact with Appellant.

As an additional concern, Castro mentioned Appellant's mother, A.M., who was not allowed to have unsupervised contact with the children because of her history with the Department. Appellant's mother often stayed in Appellant's home, but did not live there, and was permitted to accompany Appellant to her weekly parent-child visitation.

Despite those concerns, Castro emphasized that Appellant has made significant improvements. She testified that Appellant was "a totally different person," "ha[d] made a lot of progress," and had "been more engaged in actively working services." Appellant consistently attended her weekly two-hour supervised visits with T.M. and N.M. and continued to demonstrate the parenting skills she had learned. She planned activities and brought food and other necessities. It appeared to Castro that Appellant and T.M. were very bonded, and T.M. is excited to see Appellant during visits. Because of Appellant's positive changes, especially her continued participation in mental health services, Castro believed that Appellant demonstrated the ability to care for T.M., and that there was no longer a continuing danger that prevented the return of T.M. to Appellant. In her opinion, it was in T.M.'s best interest to initiate a monitored return to Appellant. When the parties returned for the final day of trial, Castro again attested that it would be safe for T.M. to return home to Appellant, and that Appellant did not have a relationship with the father.

Because Castro's opinion differed from the Department's recommendation, the Department presented the testimony of Castro's supervisor, Lekeshia White. White had never met Appellant, "[b]riefly" discussed the case with Castro, and had only been assigned to the case for thirty-three days. In support of the termination recommendation, White cited Appellant's "[c]ontinued substance use," her unknown relationship status with the father, and that Appellant's mother is with her "quite often . . . and her CPS history is a concern."

On cross-examination, however, White admitted that there was no reason to believe that Appellant would allow the father to be around the children. She also commended Appellant's progress, and when asked what else Appellant could have done, she responded:

> I am unsure of how to answer that . . . [Appellant] has made great improvement. She has. I know not everybody gets sober, addresses their mental health, all in our or the Department's timeline.

> It is concerning that there was still a positive test as recently as two months ago. . . . So I just . . . it is hard to answer that question.

White confirmed that the Department had intended to initiate a monitored return a few months before trial, and that Appellant "ha[d] long periods of not using or testing negative" for drug use. After Appellant tested positive for marihuana metabolite at a level of 0.1 pg/mg, she tested negative on a hair follicle drug test in April 2025. White testified that she was not involved in the subsequent decision to seek termination rather than a monitored return, then explained: "I am still trying to wrap my head around that, if I'm being honest."

Appellant testified that she had not seen the father, other than in a court proceeding, for over a year. She believed that the father's parental rights should be terminated, and stated that, "If he's not going to do what he needs to do, then I can do it on my own." Appellant further maintained that she had never used

10

methamphetamine or fentanyl and took the Percocet pill over a year prior to trial because she was "in extreme pain" but "had to get up and go to work." She candidly discussed using a vape pen she legally purchased after being told that her parental rights might be terminated at the upcoming final hearing, but that she informed Castro of this and had not used anything since then. Appellant asked the associate judge to deny the Department's petition to terminate her parental rights to T.M. so that she could prove that she is capable of safely parenting the child through a monitored return.

Appellant's mother, A.M., testified that Appellant no longer interacts with the father, who totaled A.M.'s car while he was under the influence of drugs soon after N.M. was born. A.M. noticed "a major change" in Appellant since she started "therapy, counseling, and doing all of the things that she need[ed] to do." She noted that Appellant had gained independence from the father and his family and made much better choices. A.M. often accompanied Appellant to parent-child visitations and observed that T.M. and N.M. "love her very, very much." A.M. testified that Appellant prioritized the well-being of the children and no longer had contact with the father.

A.M. then discussed her history with the Department: she has four children, none of whom were removed, but the Department had investigated at least three referrals in the past, the most recent being in 2020. A.M. averred that Appellant could support T.M., and if daycare was not paid for through Child Care Services (CCS), A.M. would pay for it. A.M. also agreed not to have unsupervised contact with the children.

T.M. spent a brief period in a foster home following removal before he and N.M. moved into their maternal grandfather's home. When the grandfather could no longer care for the children, they were placed together in a foster home in

11

February 2025 and remained there until the final hearing. Castro testified that T.M. was doing well, his needs were being met, and his foster parents wished to adopt him.

At the conclusion of the final hearing, the associate judge terminated Appellant's parental rights to T.M. under Sections 161.001(b)(1)(D) and (E) and found termination to be in T.M.'s best interest.

The referring court granted Appellant's request for a de novo hearing, and the parties reconvened on July 22, 2025. The referring court reviewed the transcripts and exhibits from the first hearing, then Appellant presented additional evidence.

Appellant submitted to a urinalysis and hair follicle drug test on July 7, 2025, and again tested negative for all prohibited substances. Sophia Tierney, who supervised Appellant's parent-child visitations, testified that Appellant regularly attended the visitations, and she and T.M. "were always very excited to see each other." Tierney testified that when T.M. saw Appellant, he would "usually jump[] up and down and he [would] scream[] mommy and want[] to run to her." When the visits ended, he would sometimes become upset and cry. If T.M. was hurt or upset during a visit, he sought comfort from Appellant, and she responded appropriately. Appellant took T.M. to the bathroom during visits and appropriately disciplined him if necessary. And she brought supplies for any outings, such as bathing suits, sunscreen, water, juice, snacks, or other food.

Tierney observed Appellant's growth in patience and confidence as a parent, and attested that there was a strong bond between Appellant and T.M. She recalled that T.M. was "always hugging on [Appellant]," "want[ed] her to hold him all of the time," and "g[ave] her kisses." When Appellant discussed her mistakes with Tierney, she took responsibility and expressed her intention to behave differently in the future. Tierney testified that she had no concerns about Appellant's ability to

safely parent or provide a safe home environment for T.M. and believed that Appellant prioritizes the well-being of her children.

Testimony from White and T.M.'s foster mother was also presented to the referring court. White stated that she was no longer aware of any continuing danger that would prevent the return of T.M. to Appellant's care. Regarding the Department's recommended outcome, she testified that "having a negative hair follicle [test] does open the door" to consider alternatives to termination.

The parties were notified by letter that the referring court adopted the associate judge's rulings and findings. In support of its endangerment finding, the referring court wrote:

> [A]lthough [Appellant] tested negative on her most recent drug test that occurred since the trial before [the associate judge], [Appellant] has a long history of drug use with the most recent positive drug test being in March of 2025. Among other concerns, this is a case in which the child was exposed to drugs. Therefore, I find that a single drug test does not overcome a long (and recent) history of drug use.

The referring court then terminated Appellant's parental rights to T.M. pursuant to Sections 161.001(b)(1)(D), (E), and (b)(2). *See* FAM. § 161.001(b)(1)(D), (E), (b)(2). This appeal followed.

### III. *Section 161.001(b)(1)(D) and (E) – Endangerment*

In her first issue, Appellant challenges the trial court's findings that she endangered the child. *See id*. § 161.001(b)(1)(D) and (E). Because of our resolution of Appellant's second issue, we need only address the legal sufficiency challenge to the trial court's findings under Section 161.001(b)(1), which could potentially result in a rendition rather than a remand. *See J.F.C.*, 96 S.W.3d at 266; *In re J.B.*, No. 11-22-00305-CV, 2023 WL 3213089, at *5–6 (Tex. App.—Eastland May 3, 2023, no pet.) (mem. op.).

The statutory endangerment grounds require clear and convincing proof that the parent has: "(D) knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child," or "(E) engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." FAM. § 161.001(b)(1)(D), (E); *In re S.M.R.*, 434 S.W.3d 576, 585 (Tex. 2014). "[E]ndangerment encompasses a larger array of conduct that 'expose[s a child] to loss or injury' or 'jeopardize[s]' the child." *In re R.R.A.*, 687 S.W.3d 269, 277 (Tex. 2024) (quoting *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987)). The term means "more than a threat of metaphysical injury or potential ill effects of a less-than-ideal family environment," *In re E.N.C.*, 384 S.W.3d 796, 803 (Tex. 2012), but "does not require actual harm," *R.R.A.*, 687 S.W.3d at 277 (citing *Boyd*, 727 S.W.2d at 533).

To terminate a parent's rights for endangerment under subsections (D) or (E), the "parent's endangering conduct need not 'be directed at the child,'" nor must "the child actually suffer[] injury." *R.R.A.*, 687 S.W.3d at 277 (quoting *Boyd*, 727 S.W.2d at 533); *In re C.E.*, 687 S.W.3d 304, 310 (Tex. 2024). "[T]ermination under [subsection] (D) requires that the child's environment is a source of endangerment, and the parent's conduct may create that dangerous environment." *C.E.*, 687 S.W.3d at 310. "A parent's drug use, violence, or other abuse may make the child's environment endangering to the child." *In re J.S.*, 675 S.W.3d 120, 128 (Tex. App.—Dallas 2023, no pet.). "A parent acts 'knowingly' when the parent is aware that the environment creates a potential danger to the child but the parent disregards that risk." *Id.* Because conditions or surroundings cannot endanger a child unless the child is exposed to them, the relevant time frame for evaluating the applicability of subsection (D) is before the child's removal. *J.W.*, 645 S.W.3d at 749.

14

Endangerment under subsection (E), in contrast, focuses on the parent's conduct, and whether the endangerment of the child's well-being was the direct result of the parent's acts, omissions, or failures to act. *J.S.*, 687 S.W.3d at 550. Termination under subsection (E) must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required. *Id.*; *In re D.T.*, 34 S.W.3d 625, 634 (Tex. App.—Fort Worth 2000, pet. denied). "A factfinder may infer endangerment from 'a course of conduct' that presents substantial risks to the child's physical or emotional well-being." *R.R.A.*, 687 S.W.3d at 277. Further, a parent's actions prior to and after the child's removal may show an endangering course of conduct. *See J.S.*, 687 S.W.3d at 550 ("[E]ndangering conduct may include the parent's actions before the child's birth and may relate to the parent's actions while the parent had possession of other children."). "Even evidence of criminal conduct, convictions, and imprisonment prior to the birth of a child will support a finding that a parent engaged in a course of conduct that endangered the child's well-being." *In re A.J.M.*, 375 S.W.3d 599, 606 (Tex. App.—Fort Worth 2012, pet. denied); *Walker v. Tex. Dep't of Fam. & Protective Servs.*, 312 S.W.3d 608, 617 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) (Illegal drug use and offenses that occurred before the child's birth may be considered as part of a course of conduct that endangers a child.).

The evidence established that N.M. was removed because she tested positive for methamphetamine, cocaine, and marihuana. Appellant, who was pregnant with T.M. at that time, tested positive for marihuana. After T.M. was born, Appellant allowed the father to have contact with T.M. despite her knowledge of his continued drug use. Additionally, Appellant took T.M. to the Baymont Inn the day after she signed the safety plan and permitted unsupervised contact between the father and the child.

15

Viewing all of the evidence in the light most favorable to the trial court's finding under subsection (E), we hold that a rational trier of fact could have formed a firm belief or conviction that Appellant "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." FAM. § 161.001(b)(1)(E); *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). Because only one statutory ground is necessary to support termination, we need not address Appellant's complaint insofar as it relates to subsection (D). *See* FAM. § 161.001(b)(1); *In re N.G.*, 577 S.W.3d 230, 234–35 (Tex. 2019); *see also* TEX. R. APP. P. 47.1.

Accordingly, we overrule Appellant's first issue to the extent that it relates to the legal sufficiency of the evidence to support the trial court's finding under Section 161.001(b)(1)(E).

## IV. *The Best Interest of the Child*

In her second issue, Appellant challenges the legal and factual sufficiency of the evidence to support the trial court's finding that termination of her parental rights is in the best interest of the child. "'[B]est interest' is a term of art encompassing a much broader, facts-and-circumstances based evaluation that is accorded significant discretion." *In re Lee*, 411 S.W.3d 445, 460 (Tex. 2013) (quoting *Holley*, 544 S.W.2d at 371–72). We reiterate that the trial court, as the trier of fact, is the sole judge of the witnesses' credibility. *J.F.-G.*, 627 S.W.3d at 312. Thus, we generally are not at liberty to disturb the determinations of the factfinder so long as those determinations are not unreasonable. *Id.* at 311–12; *J.P.B.*, 180 S.W.3d at 573.

Evidence of each *Holley* factor is not required to support a best interest finding. *In re S.R.*, 452 S.W.3d 351, 366 (Tex. App.—Houston [14th Dist.] 2014, pet. denied); *In re S.O.*, No. 05-22-01019-CV, 2023 WL 2237084, at *11 (Tex. App.—Dallas Feb. 27, 2023, no pet.) (mem. op.). In other words, the absence of

16

evidence regarding some of these factors does not preclude a best interest finding, "particularly if [the] undisputed evidence shows the parental relationship endangered the child's safety." *In re N.T.*, 474 S.W.3d 465, 477 (Tex. App.—Dallas 2015, no pet.) (quoting *In re A.E.*, No. 05-14-01340-CV, 2015 WL 1184179, at *6 (Tex. App.—Dallas Mar. 16, 2015, pet. denied) (mem. op.)). Consequently, "evidence relating to one single factor may be adequate in a particular situation to support a finding that termination is in the best interest[] of the child." *J.S.*, 687 S.W.3d at 552 (quoting *In re K.S.*, 420 S.W.3d 852, 855 (Tex. App.—Texarkana 2014, no pet.)). Further, evidence that is relevant to Section 161.001(b)(1) termination grounds may be probative of a child's best interest determination. *See In re E.C.R.*, 402 S.W.3d 239, 249–50 (Tex. 2013) (citing *C.H.*, 89 S.W.3d at 28).

White, who "was really new to the case" and had never met Appellant, was the only witness to testify that it is in T.M.'s best interest to terminate Appellant's parental rights. She stated that termination would "give [T.M.] a sense of permanency . . . if [she was] following the case correctly, he ha[d] been in [foster] care the majority of his life," and termination "would just give him . . . a safe environment." According to White, the Department's recommendation was due in part to the unknown relationship between Appellant and the father. However, both White and Castro unequivocally agreed that there was no indication that Appellant had an ongoing relationship with him, and that any concern they had was based on their assessment of Appellant's conduct when the Department's investigation began. Conclusory testimony does not amount to more than a scintilla of evidence; in fact, "it is no evidence at all." *In re M.A.J.*, 612 S.W.3d 398, 410 (Tex. App.—Houston [1st Dist.] 2020, pet. denied); *In re A.H.*, 414 S.W.3d 802, 807 (Tex. App.—San Antonio 2013, no pet.). As such, White's half-hearted and unsubstantiated recommendation to terminate Appellant's parental rights based on her cursory

review and grasp of the case details does not constitute clear and convincing evidence.

It is true, and we recognize, that the trial court, as the factfinder, was permitted to disregard Appellant's and A.M.'s unchallenged testimony that Appellant ceased communicating with the father more than a year prior to the final hearing. *See In re H.R.M.*, 209 S.W.3d 105, 109 (Tex. 2006). Even without that clarification, the trial court was left with the Department's unknowns and uncertainties, and "[a] lack of evidence does not constitute clear and convincing evidence." *See E.N.C.*, 384 S.W.3d at 808; *M.A.J.*, 612 S.W.3d at 410. Conjecture, proof, at best by only a preponderance of the evidence, or a lack of recent evidence, is not enough for a reasonable factfinder to form a firm belief or conviction that Appellant would permit the father to have contact with T.M. *See E.N.C.*, 384 S.W.3d at 808, 810.

Evidence that supports the best interest finding includes: (1) T.M.'s positive drug test prior to removal; (2) Appellant's violation of the safety plan in October 2023; (3) Appellant's ingestion of a single Percocet pill in April 2024; and (4) Appellant's positive drug test in March 2025 for the lowest detectable amount of marihuana metabolite after legally purchasing a vape pen. Notably, Appellant's service plan does not prohibit the use of legal substances, and her criminal history is comprised of a single conviction for misdemeanor theft that she committed in July 2023. It is undisputed that T.M.'s drug exposure was not caused by any drug use by Appellant, and the record is devoid of any purported "long (and recent) history of drug use." Rather, the record shows that in the years that Appellant had been drug tested by the Department, she tested positive for marihuana twice in 2021 and 2022, and had a "cut-off level" marihuana metabolite finding in March 2025.

We conclude that the Department's recommendation to terminate Appellant's parental rights is not firmly founded in the record, which instead demonstrates

Appellant's ability to provide T.M. with a safe, drug-free home and to adequately parent the child. Appellant regularly attended parent-child visitations, completed her required services,[4] and has a strong bond with T.M. There is abundant evidence that Appellant's mental health, parenting skills, and financial independence have significantly improved, and she has secured her own home that is clean and appropriate. Contrary to the Department's assertion on appeal, Appellant took "[f]ull responsibility" for her past mistakes and has learned how to make better choices to protect her children. Just as "an uninterested parent poses an emotional and physical danger to the child" now and in the future, *In re A.J.D.-J.*, 667 S.W.3d 813, 823 (Tex. App.—Houston [1st Dist.] 2023, no pet.), evidence of a parent's willingness and commitment to meet the child's emotional and physical needs now and in the future favors the preservation of the parent-child relationship. *See Holley*, 544 S.W.2d at 371–72.

T.M. was almost three at the time of the de novo hearing. When the child is too young to express their desires, the factfinder may consider whether the child has bonded with their caregivers, are well-cared for by them, and whether the child has spent minimal time with a parent. *In re E.J.M.*, 673 S.W.3d 310, 334 (Tex. App.—San Antonio 2023, no pet.). T.M.'s foster mother testified that T.M. and N.M. are happy and well-cared for in her home and call her "mommy" and her husband "daddy." Appellant's children had been living in their current foster home for approximately five months. Notwithstanding the safety of the child in his foster home, the testimony of Castro, Tierney, Appellant, and A.M. shows that Appellant has made sustained efforts to prioritize the well-being of her children. For example,

---

[4]Relying on Castro's permanency report filed on March 5, 2025, the attorney ad litem argued that Appellant did not successfully complete her services because she "quit going" to therapy. However, Castro's report clearly states that Appellant received a certificate of completion after she attended twelve therapy sessions and continued individual therapy voluntarily that she eventually had to cease because of her work schedule.

when Appellant noticed during a visit with T.M. that he was experiencing labored breathing, she ended the visit early so T.M. could receive his breathing treatment. Even the foster mother agreed that Appellant "loves her kids and [is] working to fight for her kids."

Here, instead of making the best interest finding that it did, the trial court had the option and discretion to severely restrict Appellant's possessory rights, without terminating them, to protect T.M.'s best interest. *See In re J.J.R.S.*, 627 S.W.3d 211, 223 (Tex. 2021) (stating that the Family Code "does not require termination when a severe restriction or limitation on access can also be in the best interest of the child while preserving the possibility that the parent and child may continue to have a relationship in the future"); *see also In re W.C.*, 98 S.W.3d 753, 766 (Tex. App.—Fort Worth 2003, no pet.) ("Although [a parent's] behavior may reasonably suggest that a child would be better off with a new family, the best interest standard does not permit termination merely because a child might be better off living elsewhere."). In this instance, we conclude that the stability of T.M.'s foster home, when measured against the considerable evidence of the bond that has developed between Appellant and T.M. and her ability to adequately parent him, does not support the trial court's best interest determination.

We recognize, as the Department and the trial court do, that the involuntary termination of one's parental rights involves fundamental constitutional rights and divests the parent and the child of all legal rights, privileges, duties, and powers that would normally exist between them, except for the child's right to inherit from the parent. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985); *see Santosky v. Kramer*, 455 U.S. 745, 753 (1982). It has been said that "[t]ermination of parental rights, the total and irrevocable dissolution of the parent-child relationship, constitutes the 'death penalty' of civil cases." *In re K.M.L.*, 443 S.W.3d 101, 121 (Tex. 2014)

(Lehrmann, J., concurring). Of course, the "[t]ermination of parental rights should not be used as a mechanism to merely reallocate children to better and more prosperous parents." *M.A.J.*, 612 S.W.3d at 409. In that regard, the government must "assure that children will have frequent and continuing contact with parents who have shown the ability to act in the best interest of the child." *See* Fam. § 153.001.

Reviewing all the evidence in the light most favorable to the trial court's best interest finding while also considering the undisputed facts that do not support the finding, we conclude that the evidence is legally insufficient to support the trial court's finding that termination of Appellant's parental rights is in T.M.'s best interest. *See J.W.*, 645 S.W.3d at 741. Even if the evidence is legally sufficient, it is certainly not factually sufficient, as any evidence to support the trial court's finding is tenuous. *See M.A.J.*, 612 S.W.3d at 410. Therefore, considering all the evidence as it relates to Appellant's actions and inactions, the absence of any emotional and physical danger to T.M. now and in the future, Appellant's ability to meet the emotional and physical needs of T.M. now and in the future, and Appellant's efforts and improved parental abilities and stability, we hold that the evidence is insufficient to support the trial court's finding that termination of Appellant's parental rights is in T.M.'s best interest. *See J.W.*, 645 S.W.3d at 741; *Holley*, 544 S.W.2d at 371–72; *see also J.B.*, 2023 WL 3213089, at *5–6 (holding, for the same or similar reasons, that insufficient evidence existed to support the trial court's best interest finding); *In re A.O.*, No. 11-22-00290-CV, 2023 WL 2799132, at *3–5 (Tex. App.—Eastland Apr. 6, 2023, pet. denied) (mem. op.) (same); *In re T.S.W.*, No. 11-21-00231-CV, 2022 WL 969526, at *4–5 (Tex. App.—Eastland Mar. 31, 2022, no pet.) (mem. op.) (same).

Accordingly, we sustain Appellant's second issue.

## V. *Section 161.001(f): "Continuing Danger"*

Appellant contends in her third issue that there is insufficient evidence to support the trial court's finding that a continuing danger exists that prevents the return of the child to Appellant. *See* FAM. § 161.001(f).

Pursuant to Section 161.001(f), the trial court may not terminate the parent-child relationship unless:

> the court finds by clear and convincing evidence and describes in writing with specificity in a separate section of the order that . . . the department made reasonable efforts to return the child to the parent before commencement of a trial on the merits and despite those reasonable efforts, a continuing danger remains in the home that prevents the return of the child to the parent[.]

FAM. § 161.001(f). It is undisputed that the Department made reasonable efforts to return T.M. Appellant instead challenges the basis for the trial court's conclusion that a continuing danger remains in her home that prevents the return of T.M. For the same reasons set forth above, we conclude that the evidence is insufficient to establish the existence of a continuing danger that prevents the return of T.M. to Appellant.

White testified that "there is always a concern" that Appellant will allow the father to be around T.M., but she was "not sure" whether it constituted a continuing danger. She could not articulate a factual basis for her suspicion and agreed that there was no indication that Appellant had any contact with the father outside of a court proceeding. At the de novo hearing, White explained that the Department's concerns were alleviated "[f]or the most part," and that any remaining continuing danger "is just [the] unknown." We cannot endorse permanently severing the parent-child relationship based on the Department's failure to investigate—anything short of clear and convincing evidence that a continuing danger exists in the home will not suffice. In this case, and based on this record, we conclude that a reasonable

22

factfinder could not form a firm belief or conviction that any continuing danger remains in Appellant's home that prevents the return of T.M., or that the father would pose a continuing danger to T.M. if the child is returned to Appellant. *See M.A.J.*, 612 S.W.3d at 410.

White's stated concern of "[c]ontinued substance use" by Appellant is likewise unfounded. Castro trusted Appellant and did not believe that she is continuing to use drugs, and White, in turn, trusted Castro and had no reason to doubt her conclusions. Moreover, White testified at the de novo hearing that those concerns were alleviated. Between Appellant's drug test results with a gap of nearly three years in positive findings, she tested negative on every other drug test that was administered through the Department. Because Appellant consistently tested negative, Castro did not ask Appellant to drug test for a few months in late 2024 and early 2025. Although White reported "the non-testing for several months" as being yet another concern, she and Castro conceded that the Department, not Appellant, was responsible for the gap in drug testing. Such failures will not be held against Appellant as evidence of alleged, continued drug use. *See In re A.Y.C.*, 665 S.W.3d 800, 818 (Tex. App.—Houston [14th Dist.] 2023, pet. denied) (the lack of available programs to address the parents' issues cannot be held against the parents).

Of further significance, the results of Appellant's rapid hair test conducted by the Taylor County probation department in May 2024 were not offered at trial and thus are not part of the record, and such tests are not typically utilized by the Department as per its policy. What was admitted, however, are the results of her lab-verified urinalysis and hair follicle drug tests from the day after her rapid hair test was administered, which were negative for all prohibited substances. Appellant stated only that she had used marihuana in the past, but the record is silent regarding her frequency or duration of such use before April 2021. Considering Appellant's

23

years of negative drug test results, her admission to taking a Percocet pill on one occasion in April 2024, and her single positive drug test for marihuana metabolite that measured at the "cut-off level" of 0.1 pg/mg in March 2025, we conclude that there is factually insufficient evidence of an ongoing drug problem that would constitute a continuing danger to T.M. *Cf. In re Y.G.*, No. 01-22-00181-CV, 2022 WL 3362953, at *14 (Tex. App.—Houston [1st Dist.] Aug. 16, 2022, pet. denied) (mem. op.) (two negative drug tests among multiple positive drug tests did not negate history of drug abuse, plus history of illegal drug use and prior termination to other children based on drug use that led to neglect, supports inference that mother was at risk for future drug abuse).

Finally, A.M. cannot be considered a continuing danger that would prevent the return of T.M. Castro and White testified that A.M. was permitted to attend visitations with Appellant and to be a part of her life but could not be with the children unsupervised. Appellant and A.M. agreed that A.M. would not have unsupervised contact with T.M. if he were returned to Appellant's care, and Castro opined that A.M. was not a danger. To the contrary, the evidence demonstrated that A.M. is a source of support for Appellant and has a good relationship with T.M.

We conclude that there is insufficient evidence to support the trial court's finding that there is a continuing danger in Appellant's home that prevents the return of T.M. Rather, the record establishes that it is because of the Department's reasonable efforts that there is no longer a continuing danger that prevents T.M.'s return to Appellant.[5]

Accordingly, we sustain Appellant's third issue.

---

[5] Our holdings do not alter or affect the trial court's appointment of the Department as the child's managing conservator. *See In re J.A.J.*, 243 S.W.3d 611, 615–17 (Tex. 2007).

## VI. *This Court's Ruling*

We reverse the final order of the trial court insofar as it terminated the parental rights of Appellant to T.M. on best interest grounds and found that a continuing danger remains in Appellant's home that prevents T.M.'s return to her, and we remand this cause to the trial court for further proceedings consistent with this opinion. *See* TEX. R. APP. P. 44.1(b). We affirm the final order of the trial court in all other respects.

Any proceeding on remand must be commenced within 180 days of this court's mandate. TEX. R. APP. P. 28.4(c).


W. STACY TROTTER

JUSTICE


March 19, 2026

Panel consists of: Bailey, C.J.,
Trotter, J., and Williams, J.